IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

GARLAND SLADE, BOP#20408-074   )
                               )
v.                             )   NO. 2:05-CV-210
                               )
WASHINGTON COUNTY DETENTION    )
CENTER, NICHOLAS ANDES, DOUGLAS )
DAVIS and TIM MOORE            )

**MEMORANDUM OPINION**

This *pro se* federal prisoner's civil rights action, brought pursuant to 42 U.S.C. § 1983, was tried to the Court on September 11, 2008, on the issue of whether plaintiff was subjected to excessive force on February 13, 2004. Plaintiff Garland Slade, who is currently in the custody of the Bureau of Prisons, was a pretrial detainee housed on C-9 pod in the Washington County Detention Center ["WCDC"] when his claims accrued.[1] The three remaining defendants, Nicholas Andes, Douglas Davis, and Tim Moore were employed as officers at WCDC during the time the events precipitating this lawsuit occurred.[2]

Plaintiff contends that his right to be free from cruel and unusual punishment was violated when defendant Andes used excessive force against him following an altercation, by forcing him out of his cell, restraining his hands behind him with handcuffs, and, as he escorted plaintiff to the booking area, grabbing him by his neck, slamming his

---

[1] Defendants raised an issue at trial as to whether plaintiff was a pretrial detainee on February 13, 2004, so that his claims fell within the purview of the Due Process Clauses of the Fifth and Fourteenth Amendments, or whether he was a convicted person, in which case his claims would fall within the scope of the Eighth Amendment. This matter will be discussed later in this opinion.

[2] The employment status of all three defendants has changed—Nicholas Andes is employed as a Revenue officer with the Tennessee Department of Revenue, Don Davis is on medical leave from his position at the WCDC, and Officer Moore is now a deputy sheriff with the Washington County Sheriff's Department.

head and face into the wall, squeezing the handcuffs until they reached the maximum tightness, twisting the cuffs up against his wrists so hard that plaintiff screamed "from the excruciating pain," and slamming him head first to the floor. Throughout the incident, plaintiff screamed at the top of his voice, begging defendant Andes to stop. Defendants Davis and Moore, according to plaintiff, watched this assault and failed to stop it. Defendant Davis also supposedly remarked that he had heard plaintiff and that he sounded like a "female dog." As a result of these purported actions on the part of defendants, plaintiff claims to have sustained injuries to his wrists, jaw, and mouth. After careful consideration of the proof at trial and the record as a whole, the Court makes the following findings of fact and conclusions of law:

    1. The C-9 pod at the WCDC is designed in an L-shape, with rows of cells arrayed on two levels, upstairs and downstairs. [Defs. Ex. 12]. The officer's station, which comprises only a desk in a large open space, is sited directly in front of a hallway. At the end of the hallway is a locked door, activated by remote control. A button on the desk is pushed to "pop" the door. Lying beyond the first door is a corridor and a short distance down, another locked door which is also remotely controlled. There are cameras in the corridor, aimed at each door, and the images captured thereby are transmitted to monitors in a room some distance away, called Central Control. Pushing a button located beside the second door alerts an officer in Central Control to open it, but only after he checks the appropriate monitor to determine the identity of the person standing outside the door. Central Control also contains computers which control the cameras. Beyond the second door is another camera and a short distance beyond that camera, the corridor turns at a 90-degree angle, called "the intersection," and continues on a straight path, before veering around Central Control. This room has windows on three sides facing out and an unrestricted view up the

length of the corridor to the intersection. The estimated distance of the entire corridor is several hundred feet. [Test. of Garland Slade]. Both sides of the corridor was estimated to be several hundred feet in length.

2. Each inmate booked into the WCDC is given an Inmate Handbook, which explains the facility's policies, rules of conduct, services, programs, and the like. One of the policies in the handbook requires that a television remain in the control of its inmate owner and may not be loaned to another inmate. [Defs. Ex. 2, p. 17]. The handbook also contains a code of inmate discipline and a list of offenses, one of which is entitled, "Disrespect," and which forbids an inmate from using abusive or defamatory language or gestures toward an officer or disregarding an officer's directions or orders. [*Id*., p. 27]. When plaintiff entered the WCDC, he received a copy of the handbook.

3. Likewise, the WCDC has implemented policies and directives establishing certain protocols and rules for staff at the facility, one of which is the "Use of Force" policy. [Defs.' Ex. 11, General Order 1.3]. This policy defines for personnel with the Sheriff's Department what constitutes reasonable or unreasonable use of force and sets out progressive steps in the use of force. The first step is physical presence, meaning that the mere presence of an officer might facilitate control of a recalcitrant inmate. Physical presence also refers to the requirement that an officer must call for back-up officers or have back-up officers present to prevent a situation from escalating to a higher degree of force to gain control of an inmate.

4. Around 8:00 p.m., on February 12, 2008, while defendant Nicholas Andes, a probationary officer, was conducting a cell-to-cell inspection in C-9 pod, he observed plaintiff in possession of a television set which belonged to another inmate. When defendant Andes questioned plaintiff about the TV, plaintiff explained that he had permission from

another officer to use the television. Because plaintiff was watching a program on the TV, and because defendant Andes was busy performing his duties as a jailer, he told plaintiff that he would be back later to take the television and then left the cell. At some point, defendant Andes checked the logbook to determine whether plaintiff had been allowed to use another inmate's TV, but nothing was recorded in the logbook to verify that this was so.

5. At 2:00 a.m., [now February 13, 2005], defendant Andes returned to the cell, unplugged the television, and began toting it out, but halted when plaintiff, who had appeared to be asleep, twice called him an obscene name. Defendant Andes informed plaintiff that he would be going to the lockdown cell and, slightly bumping defendant's right shoulder with his own, plaintiff left his cell in the C-9 pod and was escorted by defendant downstairs to a desk, where defendant Tim Moore was on duty. Plaintiff was asked to hold his hands behind his back, and, when he complied, defendant Andes applied handcuffs. At this point, defendants Andes and Moore noticed that plaintiff was holding in his hand a tiny, flexible, commissary-issued pen, some three to four inches in length. Defendant Andes retrieved the pen without incident and informed plaintiff that he was taking him to a booking cell and not just a lockdown cell. In response to this announcement, plaintiff began raising a "commotion" and, ultimately, the ruckus aroused the entire pod of inmates.

6. Defendant Andes asked defendant Moore to "pop" the locked door in the hallway leading from C-pod to the corridor. When the door opened, defendant Andes, with one hand on plaintiff's back, began steering plaintiff, who was yelling, cursing, and hopping side to side, through the door and down to the second door in the corridor. Meanwhile, defendant Moore, who was now the sole officer in C-9, ran down the hallway, caught the first door before it closed, and saw plaintiff and defendant Andes at the second door in the corridor, waiting for it to open. Defendant Andes had his hands on plaintiff's back, holding

4

him against the wall, while plaintiff continued to jump, hop and curse, directing much of the cursing towards defendant Andes. Defendant Moore asked defendant Andes if he needed assistance and he replied that he did not. The second door opened and Moore observed plaintiff high-stepping down the corridor and then, halfway down, fall, face forward. Defendant Andes did not push him, plaintiff "just fell down." As defendant Andes was helping plaintiff to his feet, defendant Moore again asked if he needed help. Defendant Andes replied, "No. Go back to C-9." Moore did as he was instructed to do.

       7. Defendant Douglas Davis, the supervising officer that evening, was working in Central Control. He clicked on the monitor, the camera automatically switched to the second door, and, when he saw plaintiff with defendant Andes behind him, he opened the door fairly quickly and switched another camera to see what was going on. However, they had already passed out of view of the camera, into an area of the corridor without cameras. Some twenty-five to thirty seconds later,[3] the two turned the corner at the intersection, and defendant Davis watched them through the windows of the control room as they proceeded down the corridor. According to defendant Davis, defendant Andes had plaintiff under control, with one hand on plaintiff's handcuffs and the other on his back, though plaintiff sounded "loud and shrill" and was "bucking, cursing, and pulling side to side." After they walked past defendant Davis in the control room, he opened the door into the booking area and then clicked on one of the two cameras inside to watch them enter the booking section. However, he activated the wrong camera and was unable to see them.

       8. Officer Allen Hensley, who was on duty in the booking area, heard yelling and, almost at the same time, saw defendant Andes and plaintiff enter the area. Plaintiff was

---

[3] This was a little longer than would be normally expected to travel through the section of corridor not monitored by a camera.

5

Case 2:05-cv-00210 Document 61 Filed 09/22/08 Page 5 of 12 PageID #: 270

still jerking around and cursing, but there was nothing to indicate to Officer Hensley that defendant Andes was angry with plaintiff or was trying to hurt him. Plaintiff was taken to a cell and afterwards calmed down. Officer Hensley saw no bleeding or bruising on plaintiff's face, but, when he removed his handcuffs, plaintiff's hands were empurpled.

9. According to jail protocol, an inmate brought to a disciplinary cell who complains must be attended to promptly by a medical care provider. In accordance with this protocol, Nurse Tina Tucker was the next person to reach the booking area. Plaintiff was still handcuffed when she arrived but, when the cuffs then were removed, she walked into his cell. He told her he had a headache and pain in his wrists, but did not mention that he had been slammed into the walls from the C-9 pod to the booking area. She noted that his neck was scratched, though the skin was not broken or bleeding, that his hands had lost circulation, were discolored, and had indentations on them, inferentially, from the handcuffs. There was no swelling or bleeding on his head and, by the time the exam was over, circulation had returned to his hands. She treated him with Ibuprofen.

10. Major Brenda Downs, Detention Center Administrator, terminated defendant Andes on February 17, 2005 for poor job performance and violation of the WCDC's "Use of Force" policy. Defendant Andes' deficient job performance and policy violation both involved his failure to call for, use, or have present back-up officers to assist him in dealing with plaintiff's disruptive conduct, or "tirade," as his mother described his past behavior.

11. Nine days after the altercation, X-rays were taken of plaintiff's right wrist and jaw, upon the request of Major Downs. According to Major Downs, she believed that, based upon past remarks plaintiff had made, he was "looking for a lawsuit" and she hoped to prevent the occurrence of any contemplated litigation in connection with his detention in

6

the WCDC. The results of the X-rays were normal, except that they showed a previous injury to the left angle of plaintiff's jaw. Also, days after the incident, a Detention Center nurse was in the area where plaintiff's cell was located when he pulled down his lip, showed it to the nurse, and complained that his lips had been bleeding. The nurse saw no bleeding and no need for medical treatment. Plaintiff, thereafter, filled out two sick call requests, not to complain about bleeding lips or head or facial injuries or pain, but to complain about acne, hand pain, and weight loss.

    12. Because the head and face are highly vascularized, i.e., rich with blood vessels, injuries to these parts of the body are expected to bleed profusely and result, almost immediately, in bruising. The floors at the WCDC are hard-surfaced and the walls are constructed of painted cinder blocks. According to the trial testimony of the WCDC physician, an inmate who is slammed into the walls at the WCDC, pushed to the floor with his face impacting the floor, and, every other step, shoved into the wall on his face or head, would sustain, within a reasonable degree of medical certainty, very visible injuries, including lacerations, bleeding, bruising, and abrasions around his face and head.

    13. Plaintiff was housed in the WCDC from January of 2004 to May, 2005. A jury convicted him of a federal offense on October 26, 2004, and the Court sentenced him for that offense on April 21, 2005. The incident at the WCDC occurred on February 13, 2005, after plaintiff was convicted, but before he was sentenced.

    14. Pretrial detainees and convicted individuals retain certain constitutional rights while incarcerated, but the source of their constitutional protections depends upon their status. The Eighth Amendment serves as primary source of protection for a convicted prisoner who asserts a claim of excessive force, *Whitley v. Albers*, 475 U.S. 312, 327 (1986); *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979), whereas a pretrial detainee is entitled to the

7

Case 2:05-cv-00210   Document 61   Filed 09/22/08   Page 7 of 12   PageID #: 272

same protection by way of the Due Process Clauses of the Fifth and Fourteenth Amendments. *See id.*; *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

15. The circuits, however, are split as to the source of the protections enjoyed by a convicted but yet-to-be sentenced prisoner. *See Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (protected under Eighth Amendment); *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994) (same); *Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990) (same); *but see Fuentes v. Wagner*, 206 F.3d 335, 341 (3d Cir. 2000) (protected under the Due Process Clause). While the Sixth Circuit has not decided this issue, it has held that prisoners' Eighth Amendment rights are analogous to the due process rights of pretrial detainees. *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). *See also City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983) (noting that "the due process rights of a [pretrial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner") (citing *Bell*, 441 U.S. at 535 n. 16). Hence, the analysis which applies to Eighth Amendment claims of excessive force will be employed to evaluate plaintiff's claim as well. *See Weiss v. Cooley*, 230 F.3d1027, 1033 (7th Cir. 2000) (noting that there is "little practical difference" between standards utilized under the Eighth Amendment for prisoners and the Fourteenth Amendment for pretrial detainees).

16. The Cruel and Unusual Punishment provision of the Eighth Amendment protects prisoners from the infliction of "unnecessary and wanton pain and suffering." *Whitley*, 475 U.S. at 319. An Eighth Amendment claim contains both a subjective and an objective component. *Farmer v. Brennan*, 511 U.S. 825, 833-36 (1994). The subjective inquiry is focused on whether the use of force is considered to be punishment, and whether the force constitutes punishment depends, in turn, upon the officer's intent. For example, an officer who uses force in a good faith effort to restore order or discipline after a prison

8

disturbance, regardless of whether the disturbance is major or minor, lacks the intent to punish. *Hudson v.McMillian*, 503 U.S. 1, 6-7 (1992); *Whitley,* 475 U.S. at 320. However, if he uses force maliciously and sadistically, without provocation and with the intention of causing harm to the prisoner, then the force used amounts to punishment. *Id.*

In order to determine whether force was used in good faith to restore order or maliciously to cause harm, courts must consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted." *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321. Additional factors to be considered are "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Ibid*.

17. After sifting through the testimony and exhibits offered at trial, the Court finds that defendant Andes restrained plaintiff, removed him from C-9 pod, and forced him down the corridor to the booking cell, for a legitimate penological purpose. The force was used initially because plaintiff had cursed and used obscenities towards Officer Andes — an infraction of inmate rules—and because of the disruption he thereafter caused in the pod. Plaintiff, from all descriptions, including his own and his mother's, had begun to engage in a "tirade," which had awakened and aroused the other inmates. Institutional order is a paramount concern in a correctional facility. A situation involving an out-of-control inmate poses a risk to an orderly-functioning institution and the safety of the facility, the staff, and the others inmates because such a situation can soon escalate into something much more serious, e.g., a riot. The questions to be answered now are what amount of force was used and what was the nature of plaintiff's injuries.

18. To answer these questions, the Court relies on the testimony and exhibits

9

offered at trial. The testimony indicated that plaintiff's hands were discolored and indented because the handcuffs were too tight. The nurse who attended plaintiff immediately after he arrived in the booking area noted these injuries, as well as scratches on his neck. Plaintiff testified that he sustained bruises on his knees, knots on the back of his head, screws in his mouth became loosened [at trial, plaintiff had a metal apparatus in his mouth, perhaps related to the injury to his jaw], and that he had pain in his back and neck.

Defendants Andes, Moore, and Davis all described how plaintiff jerked and hopped from side-to-side as he moved down the corridor. Defendant Andes denied that he slammed plaintiff's head or face into the wall and that he assaulted him. Plaintiff, however, testified that defendant Andes took him by the cuffs, slammed his head into the wall so many times that he could not count, picked him up and slammed him on the concrete on his head and face, and slammed him into the walls "every other step" all the way to booking. But, he also testified, on cross-examination, that he "was blessed that [he] didn't receive any type of injury."

Moreover, the X-rays taken of his jaw and left hand were normal. Additionally, the nurse who observed the discoloration in his hands also noted that plaintiff had no problem with the range of motion in his wrists and that the circulation had returned to his hands by the time she concluded her examination. And, she did not see any swelling or bleeding on his head and he did not complain that he had been pushed into the walls or had his head shoved into the walls.

A physician testified that, had an inmate been subjected to the kind of head and face trauma to which plaintiff had testified, those injuries would have resulted in bleeding and bruising due to the vascularity of those areas. Finally, plaintiff's sick call requests, in which he complained of hand pain and acne, do not bear out that his head and face were

10

slammed repeatedly into the walls and the floor on his way to the booking area.

Therefore, based on this evidence, the Court concludes that plaintiff's injuries were not serious, and this point (i.e., the nature of the injuries) is also relevant to the inquiry into the amount of force used against the defendant.[4] *Hudson*, 503 U.S. at 7. As depicted in the trial record, the amount of force used by defendant Andes—while not minimal—does not appear excessive under the circumstances.

19. Correctional officials are charged with taking reasonable steps to ensure the safety of staff and inmates alike in a "volatile community" which includes, not only first-time offenders and persons convicted of non-violent crimes, but also those who "may have little regard for the safety of others" and who may have a tendency to engage in "antisocial...and often violent conduct." *See Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984) (internal quotation marks omitted). In a perfect world, the use of the force depicted in plaintiff's trial testimony would be unnecessary. But, in deference to the defendant officers who were confronted with plaintiff's disruptive conduct, given the institutional environment in which it occurred, *see Wolff v. McDonnell*, 418 U.S. 539, 561 (1974) (noting that a prison is a "closed, and tightly controlled environment peopled by those who...may have little regard for ... the rules), the Court cannot find the amount of force used to be excessive. Thus, the force, seemingly, was needed to resolve a disturbance which indisputably posed a threat to the order of the WCDC and to the safety of its inmates and staff. Defendants took the actions they did to restore order to the WCDC; they did not act in a malicious and sadistic fashion for the very purpose of causing harm to plaintiff.

Although the Court need not examine whether plaintiff has satisfied the

---

[4] The extent of injury is relevant to both components of an Eighth Amendment claim for excessive force—the subjective component (whether the defendant possessed a sufficiently culpable state of mind) and the objective component (whether the defendant's conduct was harmful enough to implicate the Eighth Amendment). *Hudson*, 503 U.S. 1, 8-10.

Case 2:05-cv-00210   Document 61   Filed 09/22/08   Page 11 of 12   PageID #: 276

objective element of the claim (i.e, whether the force was "harmful enough"), suffice it to say that he would not have had to prove significant injury. *See Hudson*, 503 U.S. at 8-10 ("Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury"). He, however, would have had to show more than minimal harm to satisfy this element of his claim. *Id.* at 8-9 (finding that Eighth Amendment allows minimal uses of physical force which are not "repugnant to the conscience of mankind") (quoting *Whitley*, 475 U.S. at 327).

Thus, plaintiff's burden, with respect to the subjective component of his claim was to establish facts "that would support a reliable inference of wantonness in the infliction of pain," *Albers*, 475 U.S. at 321, and with respect to the objective part, to establish that the harm was sufficiently serious.

20. Plaintiff has failed to bear his burden and, thereby, has failed to show that defendant Andes violated the Fifth or the Eighth Amendments by using excessive force against him on February 13, 2005, at the WCDC. Nor has he shown that defendants Moore and Davis watched excessive force being used against him and failed to protect him. Therefore, judgment will enter on behalf of defendants and plaintiff shall take nothing on his claims of excessive force.

A separate order will enter dismissing this action.

**ENTER**:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE